UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

SHERYL MILLER,

                Plaintiff,

v.

WILLIAM BEAUMONT HOSPITAL
dba BEAUMONT HEALTH SYSTEM,

                Defendant.

Case No. 3:21-cv-12259

Hon. Robert H. Cleland

Magistrate Judge Anthony P. Patti

---

CARLA D. AIKENS, P.L.C.
Carla D. Aikens (P69530)
Austen J. Shearouse (P84852)
615 Griswold, Suite 709
Detroit, MI 48226
(844) 835-2993
carla@aikenslawfirm.com
austen@aikenslawfirm.com
Attorneys for Plaintiff

JACKSON LEWIS P.C.
Katherine J. Van Dyke (P62806)
Elyse K. Culberson (P82132)
2000 Town Center, Suite 1650
Southfield, MI 48075
(248) 936-1900
katherine.vandyke@jacksonlewis.com
elyse.culberson@jacksonlewis.com
Attorneys for Defendant

---

## DEFENDANT WILLIAM BEAUMONT HOSPITAL'S MOTION FOR SUMMARY JUDGMENT

Pursuant to Fed. R. Civ. P. 56(c), William Beaumont Hospital ("Beaumont") moves this Court to dismiss Plaintiff Sheryl Miller's ("Plaintiff") Complaint with prejudice. In support of its Motion, Beaumont relies on the attached Brief in Support of its Motion for Summary Judgment and upon the pleadings on file with this Court.

1

Counsel for Beaumont sought concurrence in the relief requested from Plaintiff's counsel on May 21, 2023, but such concurrence was not forthcoming.

WHEREFORE, Beaumont respectfully requests that this Court grant its Motion for Summary Judgment, dismiss Plaintiff's Complaint in its entirety and with prejudice, and award Beaumont its costs, interest, and attorneys' fees as allowed by law.

Respectfully submitted,
JACKSON LEWIS P.C.

/s/ Elyse K. Culberson
Katherine J. Van Dyke (P62806)
Elyse K. Culberson (P82132)
2000 Town Center, Suite 1650
Southfield, MI 48075
(248) 936-1900
katherine.vandyke@jacksonlewis.com
elyse.culberson@jacksonlewis.com

Dated: May 22, 2023                    Attorneys for Defendant

2

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

SHERYL MILLER,

        Plaintiff,

v.

WILLIAM BEAUMONT HOSPITAL
dba BEAUMONT HEALTH SYSTEM,

        Defendant.

Case No. 3:21-cv-12259

Hon. Robert H. Cleland

Magistrate Judge Anthony P. Patti

---

CARLA D. AIKENS, P.L.C.
Carla D. Aikens (P69530)
Austen J. Shearouse (P84852)
615 Griswold, Suite 709
Detroit, MI 48226
(844) 835-2993
carla@aikenslawfirm.com
austen@aikenslawfirm.com
Attorneys for Plaintiff

JACKSON LEWIS P.C.
Katherine J. Van Dyke (P62806)
Elyse K. Culberson (P82132)
2000 Town Center, Suite 1650
Southfield, MI 48075
(248) 936-1900
katherine.vandyke@jacksonlewis.com
elyse.culberson@jacksonlewis.com
Attorneys for Defendant

---

**DEFENDANT WILLIAM BEAUMONT HOSPITAL'S
BRIEF IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT**

i

## **TABLE OF CONTENTS**

TABLE OF AUTHORITIES ................................. **Error! Bookmark not defined.**

STATEMENT OF ISSUES PRESENTED.......................................................... vi

I.    STATEMENT OF MATERIAL FACTS ............................................................1

   A.  Plaintiff's Hire and Transfer to Beaumont's Trenton Hospital .......................1

   B.  Plaintiff's 2019 FMLA Leaves..........................................................................2

   C.  Complaints About Plaintiff's Performance .......................................................2

   D.  The Impact of COVID-19 on Beaumont's PAR Department ..........................4

   E.  Plaintiff's Return from the COVID-19-Related Leave ...................................9

   F.  Plaintiff's EEOC Charge ...............................................................................10

   G.  Plaintiff's Performance Issues After Her Return from Leave .......................11

   H.  Plaintiff's Performance Issues under a Different Supervisor .......................13

   I.  Plaintiff's FMLA Leaves Starting in October 2020 .....................................14

II.   STANDARD OF REVIEW ...........................................................................16

   A.  Plaintiff Was Not Denied a Reasonable Accommodation ............................16

   B.  Plaintiff's FMLA Interference Claim Fails Where Plaintiff Was Granted All Requested Leave and Was Returned to the Same Position ..................................19

   C.  Plaintiff Cannot Establish Discrimination or Retaliation .............................21

   1.  Plaintiff Cannot Establish a *Prima Facie* Case of Disability Discrimination or Retaliation. ..................................................................................................21

   2.  Plaintiff Cannot Establish Pretext to Support Discrimination or Retaliation. 24

III. CONCLUSION ...............................................................................................25

ii

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Ackerman v. Diamond Shamrock Corp.*,
    670 F2d 66 (6th Cir. 1992) ...................................................................25

*Alexander v. Northland Inn*,
    321 F.3d 723 (8th Cir. 2003) ...............................................................18

*Braithwaite v. Timken Co.*,
    258 F.3d 488 (6th Cir. 2001) ...............................................................25

*Burlington Northern & Santa Fe Ry. v. White*,
    548 U.S. 53 (2006) ...............................................................................23

*Chevron USA, Inc. v. Echazabal*,
    536 U.S. 73 (2002) ...............................................................................18

*Copeland v. Machulis*,
    57 F.3d 476 (6th Cir. 1995) .................................................................16

*Dobbs-Weinstein v. Vanderbilt Univ.*,
    185 F.3d 542 (6th Cir. 1999) ...............................................................23

*Donald v. Sybra, Inc.*,
    667 F.3d 757 (6th Cir. 2012) ........................................................19, 22

*Edgar v. JAC Prods.*,
    443 F.3d 501 (6th Cir. 2006) ........................................................19, 20

*Ferrari v. Ford Motor Co.*,
    826 F.3d 885 (6th Cir. 2016) ...............................................................25

*Hazle v. Ford Motor*,
    464 Mich. 456 ......................................................................................24

*Hedrick v. Western Reserve Care Sys.*,
    355 F.3d 444 (6th Cir. 2004) ...............................................................18

*Hollins v. Atlantic Co.*,
    188 F.3d 652 (6th Cir. 1999) ............................................................23

*Jones v. Potter*,
    488 F.3d 397 (6th Cir. 2007) ............................................................22

*Kempter v. Mich. Bell Tel. Co.*,
    534 Fed. Appx. 487 (6th Cir. 2013)...................................................17

*Koshinski v. Decatur Foundry, Inc.*,
    177 F.3d 500 (7th Cir. 1999) ............................................................18

*McDonald v. Union Camp Corp.*,
    898 F.2d 1155 (6th Cir. 1990) ..........................................................25

*McDonnell Douglas v. Green*,
    411 U.S. 792 (1973)..........................................................................21

*Pickney v. Potter*,
    186 F. App'x 919 (11th Cir. 2006) ...................................................18

*Scott v. Harris*,
    550 U.S. 372 (2007)..........................................................................16

*Strouss v. Mich. Dept. of Corr.*
    ,250 F.3d 336, 342 (6th Cir. 2001)....................................................22

*Town v Michigan Bell Tel Co*,
    455 Mich 688 (1997) ........................................................................22

*Univ. of Tex. Sw. Med. Ctr. v. Nassar*,
    570 U.S. 338 (2013)..........................................................................21

*Walborn v. Erie County Care Facility*,
    150 F.3d 584 (6th Cir. 1998) ............................................................22

*Walsh v. UPS*,
    201 F.3d 718 (6th Cir. 2000) ............................................................18

*Washington v. Wayne Cty. Cmty. College Fed'n of Teachers*,
    No. 5:20-cv-10289, 2021 U.S. Dist. LEXIS 240863 (E.D. Mich.
    Apr. 15, 2021) ...................................................................................17

*White v. Baxter Healthcare Corp.*,
    533 F.3d 381 (6th Cir. 2008) ..............................................................24

*Wiegel v. Baptist Hosp. of East Ten.*,
    302 F.3d 367 (6th Cir. 2002) ............................................................22

**Statutes**

42 U.S.C. § 12113(b) .........................................................................18

MCL § 37.210(18) ............................................................................17

**Other Authorities**

29 C.F.R. §§ 1630.2(r), 1630.15(b)(2)...................................................18

Fed. R. Civ. P. 56 .............................................................................16

## <u>STATEMENT OF ISSUES PRESENTED</u>

A.   Should Plaintiff Sheryl Miller's ("Plaintiff") claims for failure to accommodate under the Americans with Disabilities Act ("ADA") and Michigan's Persons with Disabilities Civil Rights Act ("PDCRA") (Counts I and II) be dismissed where Plaintiff cannot establish that she was denied a reasonable accommodation?

Defendant Answers: "Yes."


B.   Should Plaintiff's claim for interference and retaliation under the Family and Medical Leave Act ("FMLA") (Count III) be dismissed where Defendant Beaumont Health ("Beaumont") has granted Plaintiff all leave to which she has been entitled and Beaumont did not otherwise interfere with her rights under the FMLA; and where Plaintiff cannot establish an adverse employment action, causal connection, or pretext?

Defendant Answers: "Yes."


C.   Should Plaintiff's claims for disability discrimination and retaliation under the ADA and PDCRA (Counts IV, V, VI, and VII) be dismissed where she cannot establish an adverse employment action, circumstances giving rise to an inference of discrimination or retaliation, a causal connection between any alleged adverse action and her alleged disability and/or protected activity, or pretext?

Defendant Answers: "Yes"

## I.   STATEMENT OF MATERIAL FACTS

**A.   <u>Plaintiff's Hire and Transfer to Beaumont's Trenton Hospital</u>**

1.      On June 5, 2017, Beaumont hired Plaintiff as a Patient Access Specialist ("PAS") at its Taylor Hospital. (Ex. 1, Miller Dep. Tr. 22.) On January 13, 2019, Plaintiff transferred to Beaumont's Trenton Hospital, where she remains employed as a PAS. (Ex. 1, Miller Dep. Tr. at 22; Ex. 3, 12/27/18 Transfer Letter.)

2.      As a PAS, Plaintiff reports to a Patient Access Registration ("PAR") Supervisor and is responsible for "registering patients in an accurate and timely manner by obtaining individual identifying information and biographical data following appropriate [patient] check in processes." (Ex. 2, Job Description.)

3.      Plaintiff understands the critical importance of obtaining accurate identifying and biographical information from patients and inputting that data into Beaumont's system during the check-in process. (*Id*.) Indeed, Plaintiff admits that failing to do so creates serious safety issues for patients and hinders their care. (Ex. 1, Miller Dep. Tr. 152.)

4.      When Plaintiff transferred to the Trenton hospital in January 2019, she began reporting to Roseanna Von Linsowe, PAR Supervisor. (Ex. 1, Miller Dep. Tr. 35; Ex. 6, Von Linsowe Decl. ¶ 10.) At that time, PAR had three registration areas in the Trenton Hospital: (1) the Medical Office Building ("MOB"), which encompassed the Breast Care Center ("BCC"); (2) Radiology;

1

and (3) Surgery. (Ex. 6, Von Linsowe Decl. ¶ 6.)

5.      PAR staff, including Plaintiff, were generally hired on a "rotating schedule," meaning they rotated through the different areas of registration. (*Id*.; Ex. 3.) Prior to the COVID-19 Pandemic (the "Pandemic"), Beth Karr, PAR Director, placed PAR staff at their preferred registration area when department needs were met. (Ex. 6, Von Linsowe Decl. ¶ 7.) Before the Pandemic, Plaintiff's stated preference was to work in the BCC. (*Id*.)

**B.      Plaintiff's 2019 FMLA Leaves**

6.      On or about April 30, 2019 Plaintiff was approved for an intermittent leave of absence under the FMLA from April 29, 2019 through April 29, 2020 for her asthma. (Ex. 7, 4/30/19 FMLA Approval.)

7.      On December 10, 2019, Plaintiff was approved for a continuous leave of absence under the FMLA from December 5, 2019 through January 20, 2020 for her own serious health condition. (Ex. 8, 12/10/19 FMLA Approval.) Plaintiff returned on or about January 13, 2020. (Ex. 9, Investment Tracker p. 2.)

**C.      Complaints About Plaintiff's Performance**

8.      On June 13, 2019, a patient reported that Plaintiff complained that she was unhappy with management's instructions that she had to wear all black to work. Von Linsowe, who kept an "Investment Tracker" documenting interactions with her employees, documented that she discussed the importance of

2

professionalism with Plaintiff and encouraged her to raise concerns with management instead of patients. (Ex. 6, Von Linsowe Decl. ¶¶ 9, 12; Ex. 9, Investment Tracker p. 2.) Von Linsowe did not issue Plaintiff a Corrective Action for this incident. (Ex. 6, ¶ 12.)

9.      On October 23, 2019, Von Linsowe received a complaint from Ashley Crowley, manager of the MOB, stating that Plaintiff's registration of patients in the BCC was backed up, which resulted in patients' tests being delayed by 45 minutes. (*Id*.) Von Linsowe discussed the importance of timely registration with Plaintiff and encouraged her to contact management if she fell behind. (*Id*.) Von Linsowe did not issue a Corrective Action to Plaintiff for this incident. (*Id*.)

10.      On January 15, 2020, PAR Director Beth Karr received a complaint from Crowley, stating that due to Plaintiff's failure to timely register patients, the entire BCC was behind schedule. (Ex. 10, 1/15/20 E-mails; Ex. 6, Von Linsowe Decl. ¶ 13.) Von Linsowe met with Plaintiff to discuss the importance of timely registration and informed her that because this was not the first complaint, Plaintiff might be moved to a different registration area if she did not improve. (*Id*.)

11.      On January 16, 2020, Plaintiff met with Karr, Von Linsowe, and Plaintiff's union steward, Geri Souve, at Plaintiff's request. (*Id*. at ¶ 14.) Plaintiff requested the opportunity to improve because she enjoyed working in the BCC. Karr and Von Linsowe agreed, and Plaintiff's performance improved over the

following weeks. (*Id*.) According to Plaintiff, this incident is an example of Von Linsowe's discriminatory and retaliatory animus because of Plaintiff's alleged disability and taking FMLA leave. (Ex. 1, Miller Dep. Tr. 90-92.)

### D.   The Impact of COVID-19 on Beaumont's PAR Department

12.   In March 2020, the Pandemic hit Michigan, and all of Beaumont's hospitals were flooded with COVID-19 patients, resulting in significant changes to Beaumont's operations. These changes included the shutdown of all elective procedures and non-life-threatening imaging and surgical procedures. (Ex. 6, Von Linsowe Decl. ¶ 16.)

13.   On March 23, 2020, the PAR department received an e-mail from the MOB stating that it was closing due to the Pandemic. (Ex. 6, Von Linsowe Decl. ¶ 17; Ex. 4, Von Linsowe Dep. Tr. 14-15; Ex. 1, Miller Dep. Tr. 96.) That same day, Von Linsowe e-mailed PAR staff to explain that work assignments would change, expressed that management was doing its best to keep staff updated in the ever-changing environment, and thanked them for their efforts to keep everyone safe. (Ex. 6, Von Linsowe Decl. ¶ 17.)

14.   PAR management, human resources ("HR"), and the union worked together closely to address the disruption to staffing during the Pandemic, but things changed daily – if not hourly – as a result of the influx of COVID-19 patients, the shut-down of various departments, and ever-changing CDC guidance.

4

(Ex. 6, ¶ 15, 17; Ex. 11, Warner Dep. Tr. 12; Ex. 12, Willette Dep. Tr. 12-13.)

15.     One critical issue in March 2020 was the use and availability of N95 masks. Very quickly, there was a nationwide shortage of N95 masks, and front-line medical staff (*e.g.*, those providing direct care to patients infected, or who may be infected, with COVID-19) were unable to obtain N95 masks. (Ex. 6, ¶ 18.)  Indeed, even Ford Motor Company used its resources to create additional masks to donate to the hospitals. (Ex. 4, Von Linsowe Dep. Tr. 12.)

16.     On or about March 23, 2020, Von Linsowe received a number of N95 masks from the Materials Management Department and distributed them to PAR staff. (Ex. 6, Von Linsowe Decl. ¶ 18.) After the masks were handed out, Von Linsowe received an e-mail from hospital administration stating that because N95 masks were in short supply, they needed to be reserved for medical staff providing direct patient care. (*Id.*) Von Linsowe e-mailed all PAR staff to inform them that effective immediately, PAR would no longer use N95 masks because they were being reserved for medical staff on the front lines, but assured them that Beaumont understood the seriousness of the Pandemic and the department had plenty of PPE, which included surgical masks, gowns, and gloves. (Ex. 6, Von Linsowe Decl. ¶ 19; Ex. 4, Von Linsowe Dep. Tr. 13; Ex.1, Miller Dep. Tr. 40, 50, 120.)

17.     On March 24, 2020, Von Linsowe sent an e-mail to PAR staff informing them that because of the changes in hospital operations, there was not

enough work for all PAR staff. (Ex. 6, Von Linsowe Decl. ¶¶ 20-21.) In addition, because elective services were shut down, all PAR staff, including Plaintiff, were relocated to Trenton Hospital's Main Registration, located right outside of the Emergency Center. (*Id*.)

18.   On March 24, 2020 (the same day PAR staff were told they would be relocated to Main Registration), Plaintiff expressed to Von Linsowe that she did not feel comfortable working in Main Registration because of her health condition. (Ex. 6, Von Linsowe Decl. ¶ 23.) In response, Von Linsowe said she understood but informed Plaintiff that there were no PAR positions without patient contact. (*Id*.) Von Linsowe informed Plaintiff she could take unpaid time off or PTO, and the time would not be charged against her. (*Id*.) Von Linsowe contemporaneously documented that Plaintiff did not respond. (*Id*.)

19.   Plaintiff claims that during her March 24, 2020 conversation with Von Linsowe, she requested that she be permitted to wear her own N95 mask, but her request was denied.[1]

20.   Plaintiff submitted an FMLA certification dated March 25, 2020 placing her on a leave of absence and stating, "Patient has severe steroid dependent asthma with frequent remissions. ***She is advised to avoid any patient with flu or***

---

[1] Von Linsowe denies that Plaintiff made this request, and there is no reference to such a request in Von Linsowe's contemporaneous notes of the conversation. (Ex. 4, Von Linsowe Dep Tr. 38; Ex. 9, Investment Tracker.)

*corona virus due to high risks of severe asthma*." (Ex. 13, 3/25/20 Certification.) The doctor's note did not indicate that Plaintiff was able to perform the essential functions of her PAS position with an N95 mask.[2] (*Id.*)

21.   Plaintiff admits that she never requested any accommodation in writing. (Ex. 1, Miller Dep. Tr. 175.)

22.   On March 26, 2020, because there was not enough work for PAR staff with the shut-down of elective services, Von Linsowe e-mailed staff to seek volunteers to take paid time off or unpaid time off to avoid involuntary reductions in staffing. (Ex. 6, Von Linsowe Decl. ¶ 25.)

23.   HR and the Union reached an agreement in the event there were no volunteers to take time off whereby PAR staff would be reduced in the order of lowest seniority on each shift, and the "reduced" employees were placed in a labor pool for assignments outside of the PAR. (*Id.*)

24.   Plaintiff began her medical leave of absence on March 28, 2020, which was approved through July 31, 2020. (Ex. 14, 4/27/20 FMLA Approval.) The letter approving this leave also advised Plaintiff that because her FMLA would

---

[2] In discovery, Plaintiff also produced a note from her doctor dated March 24, 2020, which Plaintiff contends she provided to Von Linsowe. (Ex. 15, 3/24/20 Doctor's Note.) Like Plaintiff's March 25, 2020 Certification, this note is also silent as to Plaintiff's ability to perform the essential functions of her PAS position with an N95 mask. (*Id.*) Instead, Plaintiff's doctor expressly stated that "[d]ue to the current COVID 19 [*sic*] outbreak *it is recommended that she does not have patient contact at work during this time*." (*Id.*) (emphasis added.)

be exhausted as of May 22, 2020, her entitlement to job protection after May 22 would exhaust, but she could remain on a medical leave. (*Id*.)

25.     Had Plaintiff not gone on a medical leave of absence, she would have been placed in the labor pool based on her seniority and would have been assigned anywhere in the hospital like other PAR staff in the labor pool. (Ex. 6, Von Linsowe Decl. ¶ 27.) This would have directly contravened her doctor's notes stating Plaintiff could not have contact with patients with symptoms of the flu or coronavirus. (Ex. 15, 3/24/20 Doctor's Note; Ex. 13, 3/25/20 Certification.)

26.     When Plaintiff extended her leave beyond May 22, 2020, she submitted another doctor's note stating that Plaintiff should "avoid contact with any persons showing signs of influenza or COVID-19[.]" (Ex. 16, 5/5/20 E-mails.)

27.     Around April 5, 2020, PAR staff transitioned to a rotating schedule, referred to as "Centralized Registration," where PAR staff rotated through all areas of registration to allow for greater flexibility with scheduling. (Ex. 6, ¶ 29.)

28.     As elective services began to reopen around May 2020, including the BCC, HR and the union reached an agreement where PAR would be "staffed to volume" based on patient census, PAR staff in the labor pool would be redeployed in order of seniority, and all redeployed PAR staff went to Centralized Registration to rotate throughout the different registration areas in the hospital. (*Id*. at ¶ 26.)

29.     On June 29, 2020, PAR employee Renee LaBo was offered the

opportunity to work in the BCC based on union guidance, her seniority, and because she was hired in on a non-rotating, day-shift basis. (*Id.* at ¶ 28.)

**E.**  **Plaintiff's Return from the COVID-19-Related Leave**

30.  On June 11, 2020, Plaintiff called Von Linsowe stating that she would return to work on July 6, 2020 and expected to be placed in the BCC working 7:00 a.m. to 3:30 p.m. – the shift that she worked before she was placed in Main Registration at the start of the Pandemic. (Ex. 6, Von Linsowe Decl. ¶ 30.)

31.  In response, Von Linsowe reminded Plaintiff that PAR moved to Main Registration before her leave and informed her PAR was not back to being fully staffed and was operating on Centralized Registration and union guidance to restaff by seniority. (*Id.*) Von Linsowe provided Plaintiff with available shifts based on her seniority, but Plaintiff stated she needed to speak with the union. (*Id.*)

32.  Following her conversation with Plaintiff, Von Linsowe contacted Souve to confirm the Union's position on restaffing based on seniority, and Souve confirmed that PAR was following the agreed-upon protocol. (*Id.*)

33.  On June 15, 2020, Von Linsowe e-mailed Plaintiff after not hearing from her and expressed her happiness that Plaintiff would return to the PAR. Von Linsowe again asked for Plaintiff's preferred shift to complete the schedule. (*Id*)

34.  When Plaintiff returned to work on July 6, 2020, she was returned to her PAS position and was placed on a rotating schedule like the rest of PAR staff

per the agreement with the union. (*Id*. at ¶ 33.)

## F.    **Plaintiff's EEOC Charge**

35.    On August 20, 2020, Plaintiff filed a Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC"), alleging that Beaumont failed to accommodate her alleged disability and retaliated against her. (Ex. 17, EEOC Charge.) In the Charge, Plaintiff did not allege that her failure to accommodate claim was based on a request to wear her own N95 mask. (*Id*.) Despite admitting in her Charge that Beaumont provided her with a leave of absence during the Pandemic, Plaintiff alleged that Beaumont denied her a reasonable accommodation on March 26, 2020 and retaliated against her by reassigning her position in the BCC upon her return from leave. (*Id*.) Plaintiff did not claim that she was discriminated against due to an alleged disability. (*Id*.)

36.    When asked to explain her claims at deposition, Plaintiff alleged that Beaumont discriminated and retaliated against her and violated the FMLA by failing to assign her to the BCC in July 2020. (Ex. 1, Miller Dep. Tr. 106-7, 133-34, 175-77.) She also vaguely claimed that after her return to work, she received write-ups at the direction of Beaumont's "higher ups in retaliation for her 'turn[ing] Beaumont into the EEOC,'" but admitted that she could not identify the "higher ups." (*Id*.)

37.    Plaintiff also claimed during her deposition that the alleged retaliatory

10

treatment began after the EEOC allegedly visited Beaumont to investigate her Charge, but admitted that she only saw an unknown woman at the Hospital and did not actually know if this woman was from the EEOC, or if the EEOC even visited Beaumont. (Ex. 1, Miller Dep. Tr. 176-77.)

38.    The EEOC's records related to Plaintiff's Charge reflect that no interviews took place. (Ex. 18, EEOC Action History.) Moreover, the only supervisor who had knowledge of Plaintiff's Charge was Von Linsowe. (Ex. 6, Von Linsowe Decl. ¶ 38; Ex. 5, Carr Decl. ¶ 21.)

**G.    Plaintiff's Performance Issues After Her Return from Leave**

39.    On August 4, 2020, Von Linsowe received a complaint from Radiology that Plaintiff registered a patient without a prescription, which placed testing behind schedule, and asking PAR to discuss Plaintiff's accuracy with her. (Ex. 6, Von Linsowe Decl. ¶ 35.)

40.    On August 6, 2020, Von Linsowe received another complaint from Radiology stating that Plaintiff did not contact Radiology after two patients were registered for testing, asking again that these issues be addressed. (*Id.*)

41.    On August 7, 2020, Von Linsowe met with Plaintiff to discuss the complaints from Radiology, explaining that because PAR transitioned to Centralized Registration, all PAR employees needed to know, and be competent in, every area of registration. (*Id.*)

11

42.     On October 3, 2020, Von Linsowe received an e-mail from Radiology stating that Plaintiff again registered a patient without a prescription. Von Linsowe discussed this with Plaintiff, who agreed that she would be more careful. (*Id*.)

43.     On October 20, 2020, Von Linsowe received complaints from Radiology that Plaintiff's delay with registering patients was delaying testing. (*Id*.)

44.     That same day, Von Linsowe met with Plaintiff to discuss any barriers that she had with registering patients, and Plaintiff stated she did not know how to schedule a certain procedure. Von Linsowe worked with Plaintiff to teach her how to schedule that procedure. (Ex. 9, Investment Tracker p. 14.)

45.     On October 27, 2020, Von Linsowe received complaints from Radiology that Plaintiff failed to register a patient for procedures ordered by a physician. Von Linsowe reminded Plaintiff to review physician orders more closely while registering patients. (*Id*. p. 15.)

46.     On October 29, 2020, Radiology sent PAR more examples of Plaintiff's errors. Karr met with Plaintiff to discuss these issues, and Plaintiff stated she was upset because she had to put her dog to sleep. (*Id*. p. 16.)

47.     On November 6, 2020, Von Linsowe received complaints from Radiology that Plaintiff registered a patient over two hours late, requiring that the patient's testing be rescheduled and putting the entire day behind schedule. Von Linsowe discussed this complaint with Plaintiff, and Plaintiff affirmed that she

12

would be more careful. (*Id*. p. 18.)

48.    On November 23, 2020, Von Linsowe received a call from Cardiology stating that there were continuous issues when Plaintiff registered Cardiology patients. Von Linsowe discussed these complaints with Plaintiff, and Plaintiff agreed that she would be more careful. (*Id*.)

49.    Notably, Von Linsowe never issued any discipline to Plaintiff while Von Linsowe supervised Plaintiff. (Ex. 4, Von Linsowe Dep. Tr. 29.)

**H.    Plaintiff's Performance Issues under a Different Supervisor**

50.    Around November 30, 2020, Renee Carr became Plaintiff's supervisor. (Ex. 5, Carr Decl. ¶ 7; Ex. 19, Carr Dep. Tr. 14.)

51.    On January 21, 2021, Karr and Carr received three complaints from Radiology that Plaintiff: (1) registered a patient for the incorrect procedure, which resulted in the patient receiving the wrong exam; (2) registered a second patient without a script for testing, resulting in the patient having to reschedule the exam; and (3) registered a patient with the wrong name, which resulted in the patient's insurance being denied and being turned away for the procedure. (*Id*.) As a result of these issues, Plaintiff was provided additional training in Radiology. (*Id*.)

52.    On February 8, 2021, Plaintiff was issued a formal Counseling for incorrectly banding a patient with another patient's information on January 13, 2021. (Ex. 20, 2/8/21 Corrective Action.) Plaintiff admitted that failing to correctly

13

identify and band a patient creates serious safety issues for patients and hinders their care. (Ex. 1, Miller Dep. Tr. 152.)

53.     Over the following months, Plaintiff was coached and counseled several times for similar issues related to her failure to register patients with the correct identifying information and prescriptions. (Ex. 5, Carr Decl. ¶ 11.)

54.     On August 31, 2021, Beaumont received an automated alert from its Compliance and Information Technology Departments flagging unusual activity by Plaintiff in accessing a patient's file. (Ex. 5, Carr Decl. ¶ 17.) Beaumont investigated this incident, but after determining that Plaintiff did not deliberately access the patient's file, no corrective action or discipline was issued. (*Id*.; Ex. 1, Miller Dep. Tr. 76-78.) Instead, Plaintiff was required to take additional training.

55.     On October 4, 2021, Plaintiff was issued a First Written Warning for two incidents on September 16, 2021: (1) Plaintiff registered one patient with another patient's information; and (2) Plaintiff registered a second patient for a procedure on the incorrect body part. (Ex. 21, 10/4/21 Written Warning.)

I.     **Plaintiff's FMLA Leaves Starting in October 2020**

56.     In addition to the Plaintiff's intermittent and continuous FMLA leaves in 2019 and 2020, Plaintiff was approved for the following leaves:

- Plaintiff was approved for intermittent leave under the FMLA from October 8, 2020 until October 8, 2021 for her own health condition. (Ex. 24, October

14

FMLA Approval.)[3]

- Plaintiff was approved for an intermittent leave under the FMLA from April 1, 2021 through April 1, 2022 for her own condition described as "chronic osteoarthritis." (Ex. 25, FMLA Approval.)

- Plaintiff was approved for another, separate intermittent leave under the FMLA from April 14, 2021 through April 14, 2022 for her asthma. (Ex. 26, FMLA Approval.)

- Plaintiff was approved for a continuous leave of absence under the FMLA from May 12, 2021 through May 26, 2021 to care for her spouse. (Ex. 27, FMLA Approval.)

- Plaintiff was approved for an intermittent leave under the FMLA from May 27, 2021 through August 4, 2021 to continue caring for her spouse. (Ex. 28, FMLA Approval.)

57.   Plaintiff admitted that Beaumont has never denied her any FMLA leaves. (Ex. 1, Miller Dep. Tr. 74, 149-51.)[4]

58.   On September 24, 2021, Plaintiff filed her Complaint, alleging the following seven counts arising out of her request to wear an N95 mask on March 24, 2020, her various leaves of absence, and Corrective Actions: Failure to

---

[3] Although Plaintiff's request for intermittent leave was initially denied, Beaumont subsequently approved Plaintiff's intermittent FMLA leave from October 8, 2020 until October 8, 2021 despite Plaintiff's exhaustion of leave initially related to the Pandemic. (Ex. 24, October FMLA Approval.)

[4] Plaintiff only claims that Beaumont violated the FMLA by "questioning" her requesting an FMLA day on August 12, 2021. (Ex. 1, Miller Dep. Tr. 54.) Even though there was a dispute over whether Plaintiff used an FMLA day for her husband or for herself that day, the absence was ultimately approved as an FMLA day and was not recorded as an "occurrence" under the Attendance Policy. (Ex. 5, Carr Decl. ¶ 14-15; Ex. 19, Carr Dep. Tr. 28-29; Ex. 29, 8/16/21 E-mails.)

Accommodate under the Americans with Disabilities Act ("ADA") and Michigan's Persons with Disabilities Civil Rights Act ("PDCRA") (Counts 1 and 2); FMLA Interference and Retaliation (Count 3); ADA and PDCRA Retaliation (Counts 4 and 5); and ADA and PDCRA Discrimination (Counts 6 and 7). (ECF No. 1.)

59.   Plaintiff remains employed by Beaumont as a PAS to date, and has not sought leave to amend her Complaint to add additional claims or allegations.

## II.   STANDARD OF REVIEW

Under Fed. R. Civ. P. 56, a motion for summary judgment should be granted if the discovery record "show[s] that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." In response to such a motion, a plaintiff cannot rest on her pleadings; she must present significant probative evidence in support of her claims. *Copeland v. Machulis*, 57 F.3d 476, 478 (6th Cir. 1995). The "mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Scott v. Harris*, 550 U.S. 372, 380 (2007).

## III.  ARGUMENT

## A.   <u>Plaintiff Was Not Denied a Reasonable Accommodation</u>

To establish a failure to accommodate disability discrimination claim under the ADA and PDCRA, Plaintiff must show: (1) she was disabled as defined by the

statutes; (2) Beaumont was aware of the alleged disability; (3) she was otherwise qualified to perform the essential functions of her position with her proposed reasonable accommodation; and (4) Beaumont refused to provide a necessary accommodation. *Kempter v. Mich. Bell Tel. Co.*, 534 Fed. Appx. 487, 491 (6th Cir. 2013); *Washington v. Wayne Cty. Cmty. College Fed'n of Teachers*, No. 5:20-cv-10289, 2021 U.S. Dist. LEXIS 240863, *16 (E.D. Mich. Apr. 15, 2021).[5]

Here, the only accommodation that Plaintiff claims she was denied was the ability to wear her own N95 mask in March 2020. (Ex. 1, Miller Dep. Tr. 175.) As an initial matter, Plaintiff admits that she never sought this accommodation in writing. (*Id.*) Thus, Plaintiff's PDCRA claim fails and should be dismissed. MCL § 37.210(18); *Washington*, 2021 U.S. Dist. LEXIS 240863 at *18 ("Absent a written request for accommodation, a plaintiff alleging a failure to accommodate claim cannot prevail."). Additionally, and even assuming, *arguendo*, that Plaintiff did request to wear her own N95 mask (which Beaumont denies), her failure to accommodate claims still fail because (1) her requested accommodation was not reasonable as a matter of law; and (2) Beaumont nonetheless accommodated Plaintiff by providing her a medical leave of absence. First, Plaintiff's purported request to wear her own N95 mask is not reasonable where it would not have permitted her to perform the essential functions of her PAS position. Courts have

---

[5] Unpublished cases are attached as Exhibit 30.

repeatedly recognized an employer's right to refuse to place an employee in a position where the job at issue violates the employee's work restrictions. *See e.g., Alexander v. Northland Inn*, 321 F.3d 723, 727 (8th Cir. 2003) ("The ADA does not require an employer to permit an employee to perform a job function that the employee's physician has forbidden."); *Chevron USA, Inc. v. Echazabal*, 536 U.S. 73, 77-78 (2002); *Koshinski v. Decatur Foundry, Inc.*, 177 F.3d 500, 603 (7th Cir. 1999); *Pickney v. Potter*, 186 F. App'x 919, 925 (11th Cir. 2006); 42 U.S.C. § 12113(b); 29 C.F.R. §§ 1630.2(r), 1630.15(b)(2). Here, the notes from Plaintiff's doctor were silent as to N95 masks. (Exs 13, 15.) Instead, the notes unequivocally stated that Plaintiff could not have contact with patients with symptoms of the flu or COVID-19. (*Id.*) Thus, Plaintiff's proposed accommodation would have contravened Plaintiff's medical restrictions, which renders her request unreasonable as a matter of law.

Second, Plaintiff cannot establish that she was denied a reasonable accommodation where Beaumont provided her a medical leave of absence. It is well established that "an employee cannot make her employer provide a specific accommodation if another reasonable accommodation is instead provided" and a medical leave of absence can constitute a reasonable accommodation. *Hedrick v. Western Reserve Care Sys.*, 355 F.3d 444, 457 (6th Cir. 2004); *Walsh v. UPS*, 201 F.3d 718, 726 (6th Cir. 2000) ("this Circuit has recognized that a medical leave of

18

absence can constitute a reasonable accommodation"). Thus, Plaintiff's failure to accommodate claims fail and should be dismissed.

**B.** **Plaintiff's FMLA Interference Claim Fails Where Plaintiff Was Granted All Requested Leave and Was Returned to the Same Position**

Plaintiff alleges that Beaumont interfered with her rights under the FMLA by not returning her to the BCC when she returned from her medical leave of absence on July 6, 2020. To establish a prima facie case of FMLA interference, Plaintiff must show that: (1) she was an eligible employee; (2) Beaumont was an employer as defined under the FMLA; (3) she was entitled to leave under the FMLA; (4) she gave the employer notice of her intention to take leave; and (5) Beaumont denied her FMLA benefits to which she was entitled. *Donald v. Sybra, Inc.*, 667 F.3d 757 (6th Cir. 2012).

Here, the sole basis for Plaintiff's FMLA interference claim is that she was not returned to a position in the BCC at the end of her leave in July 2020. (Ex. 1, Miller Dep. Tr. 156.)[6] Crucially, Plaintiff's claim fails because she was not entitled to job protection when her FMLA entitlement exhausted on May 22, 2020 – nearly **two months before** her return on July 6, 2020. *Edgar v. JAC Prods.*, 443 F.3d 501, 506 (6th Cir. 2006) ("Once the 12-week [FMLA] period ends, however, employees … [have] no right to [job] restoration[.]") (quoting 29 U.S.C. §2614(a)(1)). Thus,

---

[6] Plaintiff admits that Beaumont has never denied her a leave of absence, either under the FMLA or otherwise. (Ex. 1, Miller Dep. Tr. 74, 149-51.)

19

because Plaintiff was not entitled to job protection under the FMLA upon her return, her interference claim fails and should be dismissed.

Even if Plaintiff's FMLA entitlement had not expired on May 22, 2020 and she retained job protection (which she did not), Plaintiff's claim still fails because she was returned to the same position she had before she went on leave in March 2020. At the time of her leave, she was no longer working in the BCC and was part of Main Registration. To the extent Plaintiff argues that she was entitled to be returned to the BCC area of registration, Plaintiff's claim fares no better where Beaumont had a legitimate reason, wholly unrelated to Plaintiff's leave of absence, for not returning her to the BCC. *Edgar*, 43 F.3d at 508 ("interference with an employee's FMLA rights does not constitute a violation if the employer has a legitimate reason unrelated to the exercise of FMLA rights for engaging in the challenged conduct."). Indeed: (1) all PAR staff were placed in Main Registration due to the Pandemic prior to Plaintiff's leave (and she returned to Main Registration upon her return); and (2) all PAR staff moved to Centralized Registration while Plaintiff was on leave. Moreover, even if Plaintiff would not have taken a leave of absence in March 2020, she would not have stayed in the BCC based on Beaumont's agreement with the union that PAR staff with the lowest seniority on their shift (i.e., Plaintiff) would have been placed in a labor pool where they would be assigned where needed within the hospital to address

20

staffing needs caused by the Pandemic. Thus, Plaintiff's FMLA interference claim should be dismissed.

**C.**     **<u>Plaintiff Cannot Establish Discrimination or Retaliation</u>**

Plaintiff does not have direct evidence of disability discrimination or retaliation. Consequently, she must prove her claims through circumstantial evidence. *McDonnell Douglas v. Green*, 411 U.S. 792, 802 (1973). Plaintiff must first establish a *prima facie* case as to each of her claims. *Id.* Second, only if she meets her *prima facie* burden, which she cannot, then Beaumont must articulate a legitimate, non-discriminatory, and non-retaliatory reason. *Id.* Once this reason is articulated, Plaintiff must prove that the articulated reason was not Beaumont's true reason, but rather a pretext for unlawful discrimination/retaliation. *Id.* While the burden of production shifts between the sides, at all times, Plaintiff bears the burden of proving that but for her alleged disability or protected activity, Beaumont would not have taken the adverse employment action at issue. *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 350-53 (2013). Plaintiff cannot meet this burden.

**1. Plaintiff Cannot Establish a *Prima Facie* Case of Disability Discrimination or Retaliation.**

To establish a *prima facie* case of disability discrimination under the ADA and PDCRA, Plaintiff must demonstrate that (1) she was disabled within the meaning of the statutes; (2) Beaumont was aware of her claimed disability; (3) she

was otherwise qualified to perform the essential functions of her position; (4) she suffered an adverse employment action because of her disability. *Jones v. Potter*, 488 F.3d 397, 403-04 (6th Cir. 2007); *Town v Michigan Bell Tel Co*, 455 Mich 688, 695 (1997).[7]

To establish a prima facie case of retaliation under the ADA, PDCRA, and FMLA, Plaintiff must show that: (1) she engaged in an activity protected by the statutes; (2) Beaumont knew that she was exercising her rights under them; (3) after learning of her protected activity, Beaumont took an employment action adverse to her; and (4) there was a causal connection between the protected activity and the adverse employment action. *Walborn v. Erie County Care Facility*, 150 F.3d 584 (6th Cir. 1998); *Sybra*, 667 F.3d at 761.

Plaintiff cannot establish a *prima facie* case of discrimination or retaliation because she did not suffer an adverse employment action. Not everything in the workplace that makes an employee unhappy is actionable; rather, to constitute an adverse employment action, the action must be one that "a reasonable employee

---

[7] This Court lacks jurisdiction over Plaintiff's ADA disability discrimination claim because it was not alleged in her EEOC Charge. *See generally*, *Strouss v. Mich. Dept. of Corr.*¸250 F.3d 336, 342 (6th Cir. 2001)("It is well settled that federal courts do not have subject matter jurisdiction to hear [ADA] claims unless the claimant explicitly files the claim in an EEOC charge or the claim can be reasonably expected to grow out of the EEOC charge."); *Wiegel v. Baptist Hosp. of East Ten.*, 302 F.3d 367, 680 (6th Cir. 2002)(a plaintiff's complaint filed in district court must be limited to the scope of the EEOC investigation reasonably expected to grow out of the charge). Dismissal of Plaintiff's ADA claim is warranted for this reason alone.

would have found [to be] materially adverse." *Burlington Northern & Santa Fe Ry. v. White*, 548 U.S. 53, 68 (2006).[8] Importantly, potentially adverse employment actions that are not final or lasting are insufficient to constitute actionable adverse actions. *Dobbs-Weinstein v. Vanderbilt Univ.*, 185 F.3d 542, 546 (6th Cir. 1999).

It is undisputed that Plaintiff was not discharged, she was never suspended nor demoted, nor did her pay or benefits ever change. Rather, when asked about alleged disability-based discrimination and retaliation at her deposition, Plaintiff only claimed that she believed her Corrective Actions were discriminatory/retaliatory and ordered by unidentified "higher ups" because she filed an EEOC Charge. (Ex. 1, Miller Dep. Tr. 106-107.) These acts, however do not constitute an adverse action, nor can Plaintiff establish that but-for her alleged disability or EEOC Charge, she would not have suffered the alleged adverse action. The record evidence establishes that every discussion and discipline with Plaintiff arose from complaints from other departments – not because of her

---

[8] *See also Hollins v. Atlantic Co.*, 188 F.3d 652, 662 (6th Cir. 1999) ("To qualify as adverse, the action must be "more disruptive than a mere inconvenience or alteration of job responsibilities. A materially adverse change might be indicated by a termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices that might be unique to a particular situation.").

alleged disability or EEOC Charge.[9] Therefore, Plaintiff cannot establish *prima facie* cases of disability discrimination or retaliation.

### 2. Plaintiff Cannot Establish Pretext to Support Discrimination or Retaliation.

Even if Plaintiff could satisfy her *prima facie* burden, which she cannot, summary judgment is still warranted because she cannot establish pretext. Beaumont has articulated legitimate, non-discriminatory, and non-retaliatory reasons for its actions, which Plaintiff has no evidence to rebut as pretext for unlawful discrimination or retaliation. Pretext can only be demonstrated by showing that the employer's stated reasons: (1) had no basis in fact, (2) were not the actual reasons, or (3) are insufficient to explain the employer's actions. *White v. Baxter Healthcare Corp.,* 533 F.3d 381, 393 (6th Cir. 2008); *Hazle v. Ford Motor,* 464 Mich. 456, 465-66; 628 N.W.2d 515 (2001).

Here, there is no evidence of pretext. Plaintiff testified at her deposition that she has no evidence to refute any corrective action she received. Rather, Plaintiff testified that she "checks her work" and believes "higher-ups" at Beaumont instructed PAR management to issue writeups because she "turned Beaumont into

---

[9] To the extent that Plaintiff relies on the Corrective Actions, Von Linsowe was not involved. The supervisor who issued them, Carr, also had no knowledge of Plaintiff's EEOC Charge. Thus, Plaintiff cannot show that Carr was somehow retaliating against Plaintiff when PAR continued to receive undisputed complaints from other departments about Plaintiff's performance.

the EEOC." (Ex. 1, Miller Dep. Tr. 134-135.) Plaintiff's subjective beliefs are insufficient. *Ackerman v. Diamond Shamrock Corp.*, 670 F2d 66 (6th Cir. 1992) (affirming summary judgment where plaintiff presented "conclusory allegations" and "personal conclusions" to rebut defendant's legitimate, nondiscriminatory reasons).[10] Thus, Plaintiff's discrimination and retaliation claims should be dismissed.

### III.    CONCLUSION

For the foregoing reasons, Beaumont respectfully requests that the Court grant its Motion for Summary Judgment in its entirety and dismiss Plaintiff's Complaint with prejudice.

Respectfully submitted,<br>
JACKSON LEWIS P.C.<br>
/s/ Elyse K. Culberson<br>
Elyse K. Culberson (P82132)<br>
Attorneys for Defendant

Dated: May 22, 2023

---

[10] Recognizing the soundness of Beaumont's actions, Plaintiff attempts to have this Court supplant its business judgment for Beaumont, but when assessing an employer's legitimate business reason, the goal of the inquiry is "not to … question the soundness of an employer's judgment." *McDonald v. Union Camp Corp.*, 898 F.2d 1155, 1160 (6th Cir. 1990). The Sixth Circuit recognizes the "honest belief" rule, which provides "that as long as the employer honestly believed the reason it gave for its employment action, an employee is not able to establish pretext even if the employer's reason is ultimately found to be mistaken." *Ferrari v. Ford Motor Co.*, 826 F.3d 885, 895 (6th Cir. 2016). The honest belief rule is satisfied if "the employer can establish its reasonable reliance on the particularized facts that were before it at the time the decision was made." *Braithwaite v. Timken Co.*, 258 F.3d 488, 494 (6th Cir. 2001).

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on May 22, 2023, I electronically filed the foregoing paper with the Clerk of the Court using the ECF system, which will send notification to all parties of record.

<u>/s/ Elyse K. Culberson</u>

4877-3355-9906, v. 6

26