EXHIBIT B

```
1              IN THE UNITED STATES DISTRICT COURT FOR THE

2                    EASTERN DISTRICT OF MICHIGAN

3                          SOUTHERN DIVISION

4    _____

5    SHERYL MILLER,

6              Plaintiff,

7         v.                            Civil Action No.

8    WILLIAM BEAUMONT HOSPITAL dba        3:21-cv-12259

9    BEAUMONT HEALTH SYSTEM,

10             Defendant.

11   _____

12              VIDEOCONFERENCE DEPOSITION OF

13                         RENEE CARR

14   DATE:          Tuesday, April 11, 2023

15   TIME:          10:30 a.m.

16   LOCATION:      Remote Proceeding

17                  2000 Town Center, Suite 1650

18                  Southfield, MI 48075

19   REPORTED BY:   Priscilla Gibbs, Notary Public

20   JOB NO.:       5866431

21

22

23

24

25

                                            Page 1
```

```
 1              A P P E A R A N C E S
 2   ON BEHALF OF PLAINTIFF SHERYL MILLER:
 3        AUSTEN J. SHEAROUSE, ESQUIRE (by videoconference)
 4        Carla D Aikens, P.L.C.
 5        615 Griswold, Suite 709
 6        Detroit, MI 48226
 7        austen@aikenslawfirm.com
 8        (469) 999-6577
 9
10   ON BEHALF OF DEFENDANT WILLIAM BEAUMONT HOSPITAL dba
11   BEAUMONT HEALTH SYSTEM:
12        ELYSE K. CULBERSON, ESQUIRE (by videoconference)
13        Jackson Lewis PC
14        2000 Town Center, Suite 1650
15        Southfield, MI 48075-1146
16        elyse.culberson@jacksonlewis.com
17        (248) 936-1900
18
19   ALSO PRESENT:
20        Jennifer Zinn, In-House Counsel (by
21        videoconference)
22        Roseanna Von Linsowe, Corporate Representative
23        for Beaumont (by videoconference)
24
25
```

Page  2

April 11, 2023

```
 1                    I N D E X

 2    EXAMINATION:                            PAGE

 3         By Mr. Shearouse                     5

 4

 5                  E X H I B I T S

 6    NO.            DESCRIPTION               PAGE

 7                  (None marked.)

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

Page  3

```
 1                    P R O C E E D I N G S
 2                    THE REPORTER:  Good morning.  My name
 3       is Priscilla Gibbs; I am the reporter assigned by
 4       Veritext to take the record of this proceeding.  We
 5       are now on the record at 10:30 a.m.
 6                         This is the deposition of Renee Carr
 7       taken in the matter of Sheryl Miller vs. William
 8       Beaumont Hospital doing business as Beaumont Health
 9       Systems on Tuesday, April 11, 2023, via Zoom.
10                         I am a notary authorized to take
11       acknowledgments and administer oaths in Michigan.
12       Parties agree that I will swear in the witness
13       remotely.
14                         Additionally, absent an objection on
15       the record before the witness is sworn, all parties
16       and the witness understand and agree that any
17       certified transcript produced from the recording of
18       this proceeding:
19                              - is intended for all uses permitted
20                              under applicable procedural and
21                              evidentiary rules and laws in the same
22                              manner as a deposition recorded by
23                              stenographic means; and
24                              - shall constitute written stipulation
25                              of such.
```

1          At this time will everyone in

2     attendance please identify yourself for the record.

3                    MR. SHEAROUSE:  Austen Shearouse on

4     behalf of the plaintiff, Sheryl Miller.

5                    MS. CULBERSON:  Elyse Culberson

6     appearing on behalf of the defendant.  Also present

7     with me this morning is Jennifer Zinn, defendant's

8     in-house counsel, as well as Roseanna Von Linsowe,

9     defendant's corporate representative.

10                    THE REPORTER:  Thank you.  Hearing no

11    objections, I will now swear in the witness.  Please

12    raise your right hand.

13    WHEREUPON,

14                        RENEE CARR,

15    called as a witness, and having been first duly sworn

16    to tell the truth, the whole truth, and nothing but

17    the truth, was examined and testified as follows:

18                    THE REPORTER:  Thank you.

19                        EXAMINATION

20    BY MR. SHEAROUSE:

21        Q    Good morning.  My name is Austen Shearouse,

22    and I represent Sheryl Miller in this matter.  Just a

23    couple of quick things before we get started.  Have

24    you ever had your deposition taken before?

25        A    I want to say, like, 30 years ago.

Page 5

1      Q     Well, yeah.  We do them mostly by Zoom now.

2   So with that comes a little bit of issues for the

3   court reporter, especially due to the lag of

4   technology.  So just make sure to give a couple of

5   seconds after my question finishes so that she has

6   adequate time to hear the question and take it down,

7   and I'm going to try to do the same for your answer.

8   I know inevitably we will still try to talk as if

9   we're in person.  It's going to happen, but let's try

10  to do our best to make it easy for the court reporter

11  on that.

12           Along that same line, make sure all your

13  answers are verbal.  So I know a tendency we have time

14  to point or talk with our hands or nod, or something

15  of that similar effect, but obviously the court

16  reporter can't take those down.  So make sure any

17  answer you give is verbal.

18           If at any point in time you need to take a

19  break, I'm happy to do that.  All I ask is that if

20  myself or Elyse has posed a question on the record

21  that we answer that question and then we take that

22  break.  I don't have a problem with that.  It's not an

23  endurance test.

24           If you don't understand any question that I

25  ask, please ask me to restate it or rephrase it.  I'm

Atkinson-Baker, A Veritext Company
(818) 551-7300          www.veritext.com

April 11, 2023

```
 1   happy to do so.  But if you answer a question, I'm
 2   going to assume that you understood the question that
 3   I was asking.  So we'll go ahead and get started here.
 4            Oh, lastly, if you don't know an answer to
 5   the question, you can't remember, "I don't know" is a
 6   completely acceptable answer.  I don't want you to
 7   guess at what you might remember, just if you can't
 8   remember affirmatively one way or the other.  That is
 9   a completely fine.  Can you state your full name for
10   the record, please?
11       A    Renee M. Carr.  That's C-A-R-R.
12       Q    And what is your date of birth?
13       A    10/13/62.
14       Q    And are you currently employed?
15       A    Yes.
16       Q    Where are you employed?
17       A    Corewell Health, formerly Beaumont.
18       Q    You said that was formerly Beaumont?
19       A    Well, yeah.  We merged so -- and our name
20   changed, so...
21       Q    With that merge, did your position change at
22   all?
23       A    No.
24       Q    What position do you currently hold?
25       A    I'm a supervisor for patient access
```

Page 7

```
 1    registration.

 2         Q    And when did you begin in that role?

 3         A    I want to say it was November 30th of 2020.

 4         Q    And then you've been working in that

 5    position from November 30th of 2020 to the present

 6    day?

 7         A    Correct.

 8         Q    And what are some of the responsibilities in

 9    your role?

10         A    Basically day-to-day, you know.  We have

11    spreadsheets we have to do, audits of patient --

12    employees' work, making sure that they're capturing

13    the correct information daily, making sure each area

14    is staffed, multiple deposits.

15         Q    So kind of general management over the

16    employees in the PAR?

17         A    Yeah.  Yes.

18         Q    And do you ever supervise a Sheryl Miller?

19         A    Well, they're all my employees.  Yes.

20         Q    Do you handle anything in relation to the

21    employees' time off requests?

22         A    Yeah.  We both -- me and the other

23    supervisors.  Yeah.  We do do that, yes.

24         Q    And who are the other supervisors currently?

25         A    The other supervisor with me is Ashley.
```

Page 8

April 11, 2023

1    Ashley Fields.

2         Q     And so you said that you two do have some

3    input on the time off requests?

4         A     Well, let me just put it this way.  They

5    have a cut off time that they have to submit that our

6    schedules are for four weeks out.  So they have a

7    cutoff when they have to submit that, and then we time

8    stamp them as we receive them.  And then you have to

9    -- you basically go in order of who put it in and

10   seniority.

11        Q     So seniority is a part of that determination

12   on if two requests were conflicting for the same time

13   from two different employees?

14        A     Typically, we allow two.  And if we can

15   squeeze it, we do three.  We don't really come across

16   that too often right now, but we try to accommodate

17   everyone.

18        Q     But if there was a need for one of those

19   employees to work that shift they requested off, is

20   seniority the first determining factor you look at?

21        A     Yes.  That would be.

22        Q     And is that a Beaumont policy?

23        A     That's their Union policy.

24        Q     And is your role with the time off requests,

25   is that similar to any role that you might have with

Page 9

1    FMLA leave?

2        A    Could you repeat that please?

3        Q    Yes, of course.  So we were talking about

4    your responsibilities with employees in the PAR on

5    their time off requests.  Do you have similar

6    responsibilities when it comes to employees using FMLA

7    leave?

8        A    FMLA leave.  That's -- they're -- that's

9    even totally out of my scope.  That is for the lead

10   specialist to handle that.  So we don't handle any of

11   that.

12       Q    Okay.  So you don't handle anything related

13   to FMLA leave?

14       A    No.  No.  If they -- if they call off FMLA,

15   there's no questions asked.  And we just -- that's it.

16       Q    And you said that the lead supervisor

17   handles FMLA leave?

18       A    That would be an, I believe, an HR

19   specialist that handles, you know, like, if it's a

20   medical leave, FMLA leave.  Us supervisors here do not

21   handle that.

22       Q    Okay.  Is there a particular person who you

23   direct people to when they're --

24       A    Well, they have to enter -- now, they have

25   to enter into the system.  And then once they do, then

Page 10

```
1    all that paperwork is sent to them to fill out by

2    their physicians or whatever.

3        Q    And in your role as supervisor for the PAR,

4    do you take care of disciplinary matters for your

5    employees as well?

6        A    Yeah.  If it needs be, yes.

7        Q    Is there a process that you go through when

8    considering discipline for an employee?

9        A    When you're meaning discipline, what do you

10   mean by discipline?

11       Q    I guess, is there a system that establishes

12   you do a verbal warning first, then a written warning,

13   then you can consider suspension.  What's, like, the

14   general process for that?

15       A    It would depend on what the incident was.

16       Q    So the severity of the incident would

17   determine the response?

18       A    I mean, they're going to get -- I'm, like,

19   trying to explain, like, yeah.  They're going to get

20   written up if they -- if they've done something.  This

21   is a very important position.  So, I mean, you're

22   talking life and death when they come walking in our

23   EC doors.  You know, you have to have that stuff,

24   correct.  There is actions that have to be taken.

25       Q    Have you ever had to write someone up during
```

Page 11

April 11, 2023

```
 1    your time at Beaumont?

 2         A    Yeah.  Yeah.

 3         Q    Did you ever have to write up Ms. Miller?

 4         A    I was sitting in there basically, yeah.

 5    We're all, you know -- because you usually --

 6    generally, when it's something like that, you bring in

 7    the Union steward.  And the supervisors are present,

 8    and you go over that, you know.  Usually one of us

 9    will speak.  We don't all, you know.  But I've been

10    present during that.

11         Q    So you've been present during a disciplinary

12    meeting involving Sheryl Miller?

13         A    Yep.

14         Q    Were you taking that lead role in that

15    meeting?

16         A    No.

17         Q    Who was taking that lead role?

18         A    I want to say -- well, Ashley, my co-worker.

19         Q    Ashley Fields was taking the lead there?

20         A    Well, she's Heaney now, but yes.

21         Q    Okay.  Was anyone else present during that

22    meeting besides you, Ms. Miller, the Union

23    representative, and Ashley Fields?

24         A    Jennifer White, our manager.

25         Q    Do you know Jennifer's title?
```

Page 12

April 11, 2023

```
 1        A    Manager.
 2        Q    And do you remember the content of that
 3   meeting?
 4        A    I'm not really for sure, you know.  I mean,
 5   I can just speculate that there's been -- or I
 6   shouldn't even say "speculate."  It has happened.
 7   Wrong reg's, you know, or leaving your designated area
 8   without proper coverage.
 9        Q    You're saying the two reasons that you would
10   have had these meetings specifically involving
11   Ms. Miller would have been due to wrong registration
12   issues and leaving designated areas?
13        A    Yes.
14        Q    Have you written anybody else up during your
15   time at Beaumont for these two things?
16        A    Yeah.  Wrong reg's.
17        Q    Who else have you written up for this?
18        A    Tammy Kolenda.
19        Q    Is she the only one?
20        A    I think she has been the only -- she was.  I
21   think so.
22        Q    So outside of Tammy Kolenda and Ms. Miller,
23   you have not had to write up anybody else during your
24   time at Belmont for wrong registration or leaving
25   designated areas?
```

Page 13

1        A     No.

2        Q     And what was the result of these meetings

3    with Ms. Miller?

4        A     The result of the meeting with what?

5        Q     With Ms. Miller.  These meetings that you're

6    referring to involving the wrong registration and

7    leaving designated areas.

8        A     Well, like I said, we have the Union

9    present.  We're present in there.  I want to say

10   Ashley was the one that did all the talking.  She just

11   -- she doesn't like it, you know.  She doesn't want to

12   sign that she did it, but we have everything plain as

13   day, you know, what happened.  There's a lot of work

14   that goes into a wrong reg that employees don't know

15   that we have to do when that happens.  Because that is

16   serious.  Like, somebody could get the wrong

17   medication, you know.  There's just a lot that -- it's

18   life or death, you know.  It can be.

19       Q     And I know you stated that you started in

20   November 30th of 2020, correct?

21       A     That is correct.

22       Q     Had you ever looked at Ms. Miller's

23   employment file before in the dates preceding your

24   start with Beaumont?

25       A     Never.

1      Q    So you wouldn't know if Ms. Miller had ever

2   received a prior write up for wrong registration?

3      A    No.  I don't go back.  I make my own

4   judgment with my, you know -- I don't go through

5   people's files.

6      Q    And when someone receives a disciplinary

7   action like these write ups that we were talking

8   about, does that affect their ability to apply for

9   other jobs within Beaumont?

10     A    No.  I -- you know, it's actually a

11  discretion, and we would never, you know -- I would

12  never, you know.  I want somebody to better

13  themselves, so I would never.

14     Q    So there's no Beaumont policy to your

15  knowledge that prevents someone from applying if

16  they've had a disciplinary action or transferring

17  within six months?

18     A    I believe it's just up to the manager.  It's

19  up to your manager's discretion.

20     Q    So it's up to the manager of the department

21  they're transferring from or transferring to?  I'm a

22  little bit confused.

23     A    It's -- it would be up to, like, say, if she

24  wanted to transfer to another department, it would be,

25  like, up to me whether or not to let her go.

Page 15

1      Q    Is that a similar requirement if someone

2  doesn't have a disciplinary action?

3      A    Yeah.  I -- well, all I can say is I've been

4  with Beaumont, Corewell, and I have never seen anybody

5  hold somebody back because of something.  Everybody

6  can make mistakes.

7      Q    Okay.  And I and I understand that.  But my

8  question is that if somebody -- so if somebody doesn't

9  have a disciplinary action on their record, is it

10 still up to the manager's discretion to allow them to

11 apply or transfer to another department?

12     A    Well, there's -- we can't not say they can't

13 apply to anything and I've never had -- crossed that

14 issue where I had to deny somebody, let me put it that

15 way.  I've never had that issue.  I would never hold

16 an anybody back.

17     Q    Right.  And I understand.  My question is,

18 like, we mentioned that it's up to the manager to

19 determine on someone who has a disciplinary action.

20 So my question is, does that same requirement apply if

21 you don't have a disciplinary action on your record?

22     A    I would say probably not, but we don't do

23 that.

24     Q    So the requirement of manager approval is

25 only if someone has a disciplinary action on their

Page 16

April 11, 2023

1    record?

2        A    You know what?  I'm just going to say I

3    don't know because I've never encountered that.

4        Q    Okay.  Fair enough.  Fair enough.  And into

5    the specific disciplines that you were talking about

6    regarding Ms. Miller, you said one of them was for

7    leaving a designated area?

8        A    Correct.  She was scheduled in what we call

9    -- we call it "quick," and that's when our emergency

10   patients come in.  It's where they arrive the patient.

11   Somebody has to be there.  There is one person that

12   arrives the emergency patients, and she left her

13   station.  And nursing, you know, said, "Where did she

14   go?"  You know, you don't abandon your station.  If

15   you have to go the restroom or anything, standard

16   protocol is you call and you get one of the other, you

17   know, employees to relieve you to go.

18       Q    And on that day in question, do you know if

19   Ms. Miller was having any stomach issues?

20       A    I'm not sure.

21       Q    Do you know where Ms. Miller was during this

22   time that she was alleged to have been improperly away

23   from her station?

24       A    I have no idea.

25       Q    So if Ms. Miller said that she was feeling

Page 17

```
 1    sick and had to rush to the bathroom, you wouldn't
 2    have any reason to disagree with that?
 3         A    She still should be calling somebody to
 4    relieve her.  She could have told the nurse, "You're
 5    going to have to run over there.  I'm not feeling
 6    well," or what.
 7         Q    Okay.  But the question was you wouldn't
 8    have any reason to disagree with the fact that if
 9    Ms. Miller said this was the reason she was away from
10    the post that that was the reason?
11         A    I don't recall her saying that.
12         Q    But do you have any evidence to the
13    contrary?
14         A    No.
15         Q    Okay.  And if somebody were going to be sick
16    at their station, would that be a reason to leave in a
17    rush?
18         A    You still have a responsibility in that EC
19    to make sure that that is -- somebody is, you know --
20    somebody is there.  Yes.  Okay.  Yes.  But you have to
21    let somebody in that area know or you make that phone
22    call.
23         Q    Right.  I understand that.  But my question
24    is just if someone felt like they were going to be
25    imminently sick at their station, with a specific one,
```

Atkinson-Baker, A Veritext Company
(818) 551-7300                    www.veritext.com

```
 1   which I'm assuming has line of sight to patients,

 2   correct?

 3        A    When the patients come in, yeah.

 4        Q    So if someone was going to be sick at that

 5   station, should they immediately rush to try to not be

 6   sick in front of patients, or should they stay and

 7   risk being sick in front of patients to make the phone

 8   call?

 9        A    I would notify who's standing there, which

10   is always a nurse.  If that was the case, then you let

11   them know right then.

12        Q    Do you know who the nurse was?

13        A    So, I mean, yeah.  If you're going to get

14   sick, but you also have to make sure coverage is

15   there.

16        Q    And do you know which nurse was there on the

17   date of this incident?

18        A    I want to say Angela, but I can't -- I don't

19   recall what her last name is.

20        Q    And was Angela the one that was asking where

21   she went?

22        A    Yeah. Said there was nobody back there.

23        Q    Is there a record of that statement that

24   Angela gave?

25        A    I'm sure.  I know that Ashley, my coworker,
```

Page 19

Remedi田

April 11, 2023

```
 1    spoke with her.
 2        Q    Have you ever seen a written statement from
 3    Angela regarding that incident?
 4        A    I have not personally, no.
 5        Q    Did you ever speak with Angela yourself
 6    about that incident?
 7        A    No.  Ashley spoke to her.
 8        Q    So any information about Angela's potential
 9    statement you heard from somebody else?
10        A    From my coworker, the other supervisor that
11    we work hand in hand, yes.
12        Q    And then you said there was another issue
13    with wrong registration.  Could you go into a little
14    bit more detail about what that situation entailed?
15        A    When a patient arrives, their job is to do
16    three identifiers, okay?  Name, date of birth,
17    address, phone number, whatever you have to do to
18    identify that you have the correct patient.  You
19    arrive that patient.  When you go back with them, you
20    know, with the wristband, you again say to the
21    patient, "Give me your name, date of birth," to
22    identify that you have that correct patient.  That's
23    standard protocol, so...
24        Q    And in specifics, what was the issue with
25    the situation involving Ms. Miller?  Do you remember
```

Page 20

1   the facts surrounding that?

2        A    Yeah.  We have plenty of documentation.  We

3   document in our investment trackers, RLs are put into

4   the system when it's a wrong reg like that, you know.

5   And we're held accountable to answer to that and to

6   make sure, you know -- to help improve that process.

7   It's a no-brainer to do three identifiers.

8        Q    So you're saying that the issue involving

9   Ms. Miller was involving these identifiers?

10       A    Well, you can't get a correct reg unless you

11  identify all -- at least three identifiers.  If you

12  cannot do all three identifiers, it is up to you to

13  make that as a new patient.  Because you know why?

14  You don't want the wrong patient because that can lead

15  to life or death.

16       Q    Right.  And I understand that.  I'm just

17  asking specifically, not generally, the practice.  I

18  understand why the practice is in place.  I'm asking

19  specifically, do you remember any facts about the

20  instance involving Ms. Miller specifically that you

21  were a part of the meeting for the write up?

22       A    She's done several different things.  I

23  can't even remember all.

24       Q    So you're just saying there were several

25  issues?

Page 21

Re: Re: Carll
April 11, 2023

 1        A     Several different things.

 2        Q     But you can't recall specifics on those?

 3        A     Well, one time she registered the patient in

 4   for an X-ray and did the wrong body part.  Do I

 5   remember when?  No, I don't remember.  Has she banded

 6   the wrong patient?  Yes.  She has banded the wrong

 7   patient.

 8        Q     And those were all write ups?

 9        A     I don't recall, but I'm sure they were.

10        Q     And do you recall if Ms. Miller signed those

11   write ups?

12        A     I don't recall.  Typically, she does not.

13   Anytime I've been there, she doesn't.  And they have

14   the right.  If they don't want to, they don't have to.

15   You can't force somebody.

16        Q     Is there any repercussion for not signing

17   one of those?

18        A     No, no.

19        Q     And we discussed earlier that you didn't

20   look over Ms. Miller's employment file prior to your

21   start date?

22        A     No.

23        Q     Okay.

24        A     I have 22 employees.  I'm not going --

25   charts.  Again, I base my own opinions.  Somebody

Atkinson-Baker, A Veritext Company
(818) 551-7300                          www.veritext.com

April 11, 2023

```
1    could say something to me about somebody.  I base my
2    own opinion.
3        Q    Kind of switching gears for a moment.  If
4    someone has a complaint with another employee or
5    manager, could they bring that complaint to you?
6        A    You said if -- could you say that again?
7        Q    Yeah.  If one of your employees has a issue
8    with a coworker or another manager, could they bring
9    that complaint to you?
10       A    They could, you know.
11       Q    Has anyone ever complained to you about
12   coworkers or managers during your time there?
13       A    Well, you're talking all different age
14   groups.  There's all kinds of things all the time, you
15   know.
16       Q    So there have been complaints just
17   generally?
18       A    Yeah.  Like, "So-and-so's doing this," or,
19   "So-and-so's doing," you know.  It's just typical, you
20   know.
21       Q    Has Ms. Miller ever brought any complaints
22   to you?
23       A    I don't recall her.  I don't recall.  You
24   mean concerning another employee, correct?
25       Q    Yes, correct.  Yes.
```

Atkinson-Baker, A Veritext Company
(818) 551-7300                    www.veritext.com

1      A     Yeah.  Not that I can recall.

2      Q     Has she ever brought any other concerns to

3   you?

4      A     I just recall not long ago that she came to

5   me and was like, "I didn't get my vacation.  I didn't

6   get my vacation."  And I'm like, "Calm down.  Calm

7   down."  And she did get her vacation.  So, you know,

8   I'm like, "You need to look a little closer because

9   you did get all your vacation days that you

10  requested."

11     Q     And do you know the date of this

12  interaction?

13     Q     Oh, it was just prior to her going -- a

14  couple weeks before she was going out on vacation.

15  Maybe even four weeks before, because we're four weeks

16  out on our schedules.

17     Q     Do you know if Ms. Miller has had issues

18  with her vacation time in the past?

19     A     No.  We're very accommodating.  Very, very

20  accommodating.  As long as we're fully staffed, which

21  everybody knows.  A lot of people -- I mean, I'm

22  thankful I'm fully staffed in my area, but there's a

23  lot of areas that are still struggling to get

24  employees back since COVID and that.  No.  We're very

25  accommodating.  I want my vacation time.

Page 24

```
 1          Q     That is very fair.

 2          A     You know, so why would I deny somebody else?

 3          Q     That is very fair.  Do you know if Ms.

 4    Miller has ever had any issues with her FMLA time

 5    while she's been working at Beaumont?

 6          A     Not that I'm aware of.  Again, that would be

 7    the specialist that you would need to reach out to.

 8          Q     What is Ms. Miller's current role within the

 9    PAR?

10          A     She's a patient access register.

11          Q     Is she assigned to a particular department?

12          A     Yeah.  Patient access registration.  That's

13    registration.  It's --

14          Q     Well, with it -- so within that, I guess I

15    need to understand a little bit better.  So within

16    patient access registration, there are specific posts

17    that people get assigned to, right?

18          A     That would be our EC arrival.  And then in

19    our back area, there's three desks.  So what happens

20    is after the patients been arrived, the physician has

21    seen the patient, then our registers that are back,

22    you know, in our "complete areas" what we call it,

23    they will go bedside to the patient.  And that's when

24    a second confirmation is done.  You know, they go over

25    that patient's name, date of birth, making sure
```

Page 25

1   address is correct, getting insurance information from

2   them and so on.

3        Q    You said that's for the EC?

4        A    That is correct.  And then we do have some

5   scheduled services that are usually our cardiology and

6   that.  They -- we have another one.  It's kind of hard

7   to explain, but we have another area where the people

8   who are working in complete also do scheduled

9   services, which usually we only have maybe 10, 15 of

10  them a day for the cardiology.  And then we do a

11  couple clinics, too.  And then we also do have our

12  surgery area, too, that we do have.

13       Q    So which of those areas does Ms. Miller work

14  in?

15       A    She works on all three.

16       Q    Is that the standard for all employees?

17       A    Well, the one that works up in surgery,

18  she's been here, like, 20 plus years, so she gets the

19  surgery.  She's she got that surgery area.  Sheryl

20  does the days that she has off, or if she's on

21  vacation, Sheryl takes up that.  Because most of them

22  don't like to work up there because it's boring,

23  really, but...

24       Q    So Sheryl kind of moves between these three

25  departments?

1      A      Mm-hmm.

2      Q      Do the --

3      A      It's one department, but three areas.

4      Q      Right.   These three areas, sorry.   The term

5    of --

6      A      It's okay.

7      Q      So between these three areas, Sheryl moves

8    depending on the schedule needs?

9      A      Typically, one day a week she's working up

10   in surgery.  Sometimes two.  Like, I think this week

11   she's working two because the surgery girl's off.  So

12   she always covers hers.  And then most of the time

13   she's down on, you know, our bottom floor arrival and

14   complete.

15     Q      Do other employees move around between these

16   areas as well in the PAR?

17     A      There's a -- some of the -- some of the

18   newer ones, they may.  Like, if Sheryl's not available

19   and say she's on vacation and our other surgery girl's

20   on vacation, a couple of them will.  A lot of them,

21   like I said, they were like, "Go ahead.  You can have

22   it."  Because it's kind of boring up there.  They like

23   that fast-paced moving kind of thing.

24     Q      For the most part, most of the PAR employees

25   stay in that downstairs EC?

Atkinson-Baker, A Veritext Company
(818) 551-7300                    www.veritext.com

```
 1        A     Correct.
 2                    MR. SHEAROUSE:  Okay.  We could go off
 3   the record for just a moment.
 4                    THE REPORTER:  Okay.  We are now off
 5   the record for a break, 11:10 a.m.
 6                    (Off the record.)
 7                    THE REPORTER:  All right.  We're back
 8   on the record.  It's 11:10 a.m.
 9   BY MR. SHEAROUSE:
10        Q     Okay.  I'm going to share a screen real
11   quick and let me know if you can see that okay.
12                    MS. CULBERSON:  Austen, can you just
13   zoom in?  Sorry.  My eyes are terrible.
14                    MR. SHEAROUSE:  Yeah.  No.  You're
15   good.  I'll get it a little bigger here.
16                    MS. CULBERSON:  Thank you.
17                    MR. SHEAROUSE:  I'll scroll up and
18   down.
19   BY MR. SHEAROUSE:
20        Q     So you see this is an email dated on
21   Beaumont Miller 000486.  Emails are dated between
22   August 16th, 17th, yeah.  August 16th and 17th.
23                    MS. CULBERSON:  And, Renee, just take
24   your time to read it.  Let Austen know if you need him
25   to scroll up or down.
```

Page 28

1          A     Oh, I totally remember all this.

2          Q     And so this situation was involving

3     Ms. Miller's FMLA, correct?

4          A     Ms. Miller called me at 3 a.m. in the

5     morning.  She was calling off.  She said to me that

6     she was calling off FMLA.  Her husband wasn't doing

7     well.  So I'm like, "No problem."  Of course, 3 a.m.

8     now I'm up for the day and always -- I always go and

9     document it right away in our investment tracker, and

10    then we also have an attendance tracker.  And I'm

11    like, "Her FMLA expired," you know, and that was it.

12         Q     And you said that you record this in the

13    investment tracker?

14         A     Yeah.

15         Q     Do you happen to have a copy of what you

16    recorded in the investment tracker on this particular

17    date?

18         A     Oh, I'm sure I can -- I'd have to go back

19    and look for it.

20               MS. CULBERSON:  Austen, the investment

21    tracker has been produced in discovery, so I'm happy

22    to point you to the --

23               MR. SHEAROUSE:  Yeah.  Could you --

24               MS. CULBERSON:  -- if you need it.

25               MR. SHEAROUSE:  Yeah.  If you could

Page 29

```
 1    show me what Bates number that was.  That'd be great.
 2                   MS. CULBERSON:  Yeah.  So do you want
 3    the Bates number just for this timeframe?
 4                   MR. SHEAROUSE:  Yeah.  Just for this
 5    timeframe is fine.
 6                   MS. CULBERSON:  So it's on Bates 582.
 7                   MR. SHEAROUSE:  Thank you.
 8    BY MR. SHEAROUSE:
 9        Q    And so you recorded that immediately after
10    this conversation with Ms. Miller?
11        A    That's the first thing because, you know --
12    so with us being supervisors, we're 24/7, okay?
13        Q    Mm-hmm.
14        A    Hospitals never close down.
15        Q    Right.
16        A    So if I'm not on call, then my co-worker's
17    on call.  I was on call.  So I got that page.  I
18    answered my page.  She called off stating FMLA.  Her
19    husband wasn't doing well.  Hung up the phone.  Of
20    course, I have to get my laptop because I need to
21    document what was just said and everything, and I had
22    to find coverage, okay?
23        Q    Mm-hmm.
24        A    So I've got three hours to find someone to
25    take up that 6 o'clock a.m. shift.  So I have to fill
```

Atkinson-Baker, A Veritext Company
(818) 551-7300                                      www.veritext.com

1   that shift.  And upon filling in my information, I'm

2   like, "Her FMLA is expired for her husband.  She

3   don't."  Typically when they call off, they only have

4   to call off FMLA.  They don't have to tell me what

5   FMLA.  It's not my business, but she happened to that

6   day.  I just want to note I did not give her a point

7   or anything for that.  I used it as an FMLA day, okay?

8       Q    And do you happen to know what area

9   Ms. Miller typically worked in prior to your start of

10  employment with Beaumont?

11      A    Oh, you mean where she worked prior?

12      Q    Yeah.  What area within the PAR would she

13  have -- that she typically worked in?  Would you have

14  any knowledge on that?

15      A    I mean, I -- in this area, you know?  I know

16  when I first came, we did have imaging and then we had

17  the Breast Care Center, but that all went away.

18      Q    So that's permanently closed down?

19      A    It's not closed.  They ended up -- they

20  ended up -- there's a manager that took over that area

21  and they split it up, I should say that.  How -- they

22  split it up.  So imaging and the Breast Care Center

23  went over to, you know, imaging area and then EC only

24  took up cardiology and EC.

25      Q    And do you know when that division took

Page 31

April 11, 2023

```
 1    place?

 2         A    Oh, it's been a while.  I don't recall.

 3         Q    Do you know what year, maybe?

 4         A    Maybe last year or the -- maybe -- I'm not

 5    sure.  I'm not sure.  I'm not really sure.

 6         Q    But sometime after 2020?

 7         A    Sometime after.  Well, yeah.  Yeah.

 8              MR. SHEAROUSE:  Okay.  I don't have

 9    anything further at this time.

10              MS. CULBERSON:  Okay.  Let me just take

11    a few minute break here.  Let me look at my notes.

12              MR. SHEAROUSE:  Yeah.  You want to just

13    say 11:25?

14              MS. CULBERSON:  Sure.  Yeah.  That's

15    fine.

16              MR. SHEAROUSE:  Okay.

17              MS. CULBERSON:  And, Renee, when we go

18    on break, you can just mute yourself and turn off your

19    camera.  We'll be back in a few minutes.

20              THE REPORTER:  We're off the record at

21    11:17 for a break.

22              (Off the record.)

23              THE REPORTER:  All right.  We're back

24    on the record, and the time is 11:27 a.m.

25              MS. CULBERSON:  Okay.  I have no
```

Page 32

```
 1    questions.
 2                 MR. SHEAROUSE:  Okay.  Nothing further.
 3    Thank you for your time, Ms. Carr.  I appreciate you
 4    taking time out of your day to answer a bunch of
 5    questions.
 6                 THE WITNESS:  Okay.  Thank you.
 7                 THE REPORTER:  Do we --
 8                 MS. CULBERSON:  Thanks for --
 9                 THE REPORTER:  Do we have any orders
10    for Renee?
11                 MR. SHEAROUSE:  I'll take a e-trans.
12                 THE REPORTER:  E-trans.
13                 MS. CULBERSON:  Same here.
14                 MR. SHEAROUSE:  Yeah.  And I'll just
15    have a standing order for e-trans on --
16                 THE REPORTER:  On all of them?  Okay.
17                 MR. SHEAROUSE:  Yeah.  It'll just make
18    it easy for you.
19                 THE REPORTER:  All right.  Thank you.
20    We're now off the record.  It's 11:28 a.m.
21                 (Whereupon, at 11:28 a.m., the
22                 proceeding was concluded.)
23
24
25
```

Page 33

1　　　　　　CERTIFICATE OF DEPOSITION OFFICER

2　　　　　　I, PRISCILLA GIBBS, the officer before whom

3　the foregoing proceedings were taken, do hereby

4　certify that any witness(es) in the foregoing

5　proceedings, prior to testifying, were duly sworn;

6　that the proceedings were recorded by me and

7　thereafter reduced to typewriting by a qualified

8　transcriptionist; that said digital audio recording of

9　said proceedings are a true and accurate record to the

10　best of my knowledge, skills, and ability; that I am

11　neither counsel for, related to, nor employed by any

12　of the parties to the action in which this was taken;

13　and, further, that I am not a relative or employee of

14　any counsel or attorney employed by the parties

15　hereto, nor financially or otherwise interested in the

16　outcome of this action.

17

　　　　　　　　　　　　PRISCILLA GIBBS

18　　　　　　　　Notary Public in and for the

19　　　　　　　　　　State of Michigan

20

21

22

23

24

25

　　　　　　　　　　　　　　Page 34

```
 1              CERTIFICATE OF TRANSCRIBER
 2              I, ANDEE WILCOX, do hereby certify that this
 3    transcript was prepared from the digital audio
 4    recording of the foregoing proceeding, that said
 5    transcript is a true and accurate record of the
 6    proceedings to the best of my knowledge, skills, and
 7    ability; that I am neither counsel for, related to,
 8    nor employed by any of the parties to the action in
 9    which this was taken; and, further, that I am not a
10    relative or employee of any counsel or attorney
11    employed by the parties hereto, nor financially or
12    otherwise interested in the outcome of this action.
13
14
                                            Andee Wilcox
15                                          ANDEE WILCOX
16
17
18
19
20
21
22
23
24
25
                                            Page 35
```